**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

BRENDAN SIEBELS, individually, and on
behalf of himself, and all others similarly
situated,

    Plaintiff,

v.

ASBURY AUTOMOTIVE GROUP, INC.

    Defendant.

Civil Action No. _____

## CLASS ACTION COMPLAINT

  Plaintiff, Brendan Siebels (hereinafter, "Plaintiff"), individually, on behalf of himself, and all others similarly situated, for his causes of action against Defendant Asbury Automotive Group, Inc. ("Defendant"), alleges upon personal knowledge as to his own actions, and upon information and belief as to all other matters, as follows:

### NATURE OF THE ACTION

  1. This action arises out of Defendant's unauthorized disclosure of the confidential personal information, Personally Identifying Information[1] ("PII") of Plaintiff and the proposed Class Members via a December 2023 cyber-attack on its information systems and Defendant's failure to reasonably mitigate against the foreseeability of such an attack. Because of Defendant's failures to implement reasonable, industry standard cybersecurity safeguards, Plaintiff and the

_____

[1] The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8).

Proposed Class Members have and will continue to suffer harm.

2.    Because of Defendant's failures, the sensitive PII of Plaintiff and the proposed class of current and former employees, and likely including candidate employees were disclosed to a notorious cyber and identity theft gang, including Plaintiff's and Class Members' names and social security numbers (the "Data Breach").[2]

3.    Although Defendant discovered the Data Breach on or about December 25, 2023, Defendant failed to notify and warn Data Breach victims of the unauthorized disclosure of their PII until April 22, 2024, an egregious four month delay.

4.    This four-month delay in notification is in stark contrast to Georgia's statutory requirement that Defendant notify Plaintiff and the proposed Class Members "in the most expedient time possible and without unreasonable delay." Ga. Code § 10-1-912.

5.    As a direct and proximate result of Defendant's failures to protect Plaintiff's and the Class Members' sensitive PII and warn them promptly and fully about the Data Breach, Plaintiff and the proposed Class have suffered widespread injury and damages necessitating Plaintiff seeking relief on a class wide basis.

6.    Indeed, Defendant's cybersecurity posture was so poor that it was unable to identify that malicious activity was in progress until the cyber gang had completed its task of stealing Plaintiff's and Class Members' valuable information.

## PARTIES

7.    Plaintiff is a natural person, and resident and citizen of the State of Missouri, and resides in St. Peters, Missouri, where he intends to stay.

8.    Defendant Asbury Automotive Group, Inc. is organized under the laws of Delaware

---

[2] Exhibit A, Notification Letter to Plaintiff.

but has its principal place of business at 2905 Premiere Parkway, Suite 300, Duluth, Georgia, 30097. It may be served through it's Registered Agent, Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners, GA 30092.

9.    Founded in 1995, Defendant is a corporation that owns 157 new vehicle dealerships across 15 states,[3] and at a given time has over 15,000 employees.

10.    Defendant offers new and used vehicles for sale, replacement parts, financing options, vehicle maintenance, and collision repair services and in 2022 alone had revenues of approximately $14.8 billion.[4]

11.    Defendant, who is "one of the largest automotive retail and service companies in the U.S., reported first quarter 2024 net income of $147 million" and "over 4 billion in revenue."[5]

## JURISDICTION AND VENUE

12.    This Court has personal jurisdiction over Defendant because Defendant operates, conducts, engages in, or carries on a business in this State; as is evidenced by the fact that it maintains its principal places of business in Georgia; and committed tortious acts in Georgia.

13.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than one hundred (100) members in the proposed Class, and at least one member of the class is a citizen of a state different from Defendant.

14.    The Court has supplemental jurisdiction over Plaintiff's claims arising under state law under 28 U.S.C. § 1367.

15.    Venue is proper under 28 U.S.C. § 1391(b)(1) and (2) because Defendant resides

_____

[3] https://investors.asburyauto.com/about-us.
[4] https://www.globaldata.com/company-profile/asbury-automotive-group-inc.
[5] https://investors.asburyauto.com/press-releases/20536.

in this District and a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this district.

## FACTUAL BACKGROUND

### A. The Data Breach

16.     Around December 23, 2023, Defendant was attacked by the notorious cyber gang Cactus Ransomware Group multi-billion dollar businesses, like Defendant.[6]

17.     Apparently before Defendant even noticed that its information systems had been breached, the attackers had time to perform reconnaissance of Defendant's digital assets, identity documents containing Plaintiff's and Class Members PII, and exfiltrate that data.

18.     Had Defendant implemented industry standard logging, monitoring, and alerting procedures and technology, Defendant could have prevented this exfiltration.

19.     Instead, the Cactus Ransomware group was able to steal value data, including social security numbers, which it then at least partially posted on the dark web via its leak site, which is where such cyber gangs often post sample data after their targets refuse to timely pay the ransom.

20.     In all, Cactus is believed to have stolen at least 62 GB of data that is selected from Defendant's information systems.[7]

21.     Notwithstanding that Defendant only notified Plaintiff that his name and social security number were impacted, the Data Breach reportedly affected individuals' names, social security numbers, passport information, photos of driver's licenses, private financial information, employee data, and more.[8]

---

[6] Hamza Tarq, *Fortune 500 Company Among the Latest Victims of the Cactus Ransomware Group* (Jan. 16, 2024), https://techlapse.com/news/asbury-automotive-hacked-by-ransomware-group.
[7] *Id.*
[8] *Id.*

22.     Though Defendant has not explained the source of the attack, or the root cause, it is likely that Defendant's cybersecurity program is woefully inadequate and could have prevented or significantly limited the attack if its cybersecurity program had met industry standards.

23.     Indeed, Defendant apparently did not even realize it was being attacked, until the attackers had completed their mission, which provides a strong indication that Defendant had failed to implement standard logging, monitoring, and alerting systems, such as data loss prevention tools, endpoint detection and response tools, and/or a security information and event management platform.

24.     Moreover, Defendant apparently lacked diligence in hardening its environment from outside attacks. According to UpGuard, Defendant has a C rating of 523 out of 950 even just for its external facing services.[9]

**B.    Defendant Holds Itself Out as a Trusted Partner**

25.     Notwithstanding its failure to implement reasonable, industry standard cybersecurity safeguards, Defendant holds itself out as a trusted partner. For example, its stated mission "is to have our guests view us as trusted, high-integrity professionals who consistently deliver an exceptional experience and genuinely care about their needs."[10]

26.     Defendant represents that it maintains a "culture of security" and "is committed to protecting the confidential information of our company, guests, team members, and other stakeholders."[11]

27.     To that end, Defendant notes that it has "an established Information Security Program which is overseen by the Information Security Committee (ISC)," who "routinely reviews

---

[9] https://www.upguard.com/security-report/asburyauto.
[10] https://socialresponsibility.asburyauto.com/community.
[11] *Id.*

the company's information security and technology risk profile."[12]

28.     This cybersecurity program apparently includes an incident response plan, security auditing, and team member training.[13]

29.     Tellingly, Defendant's website included none of this information before the Breach, and likely did not exist at that time.[14]

**C. Plaintiff Siebels**

30.     Plaintiff Siebels, a former employee of Defendant, received a data breach notification letter from Defendant on April 22, 2024. Exhibit A.

31.     The letter failed to include any information regarding the source of the attack or any specific information on what Defendant was doing to prevent such an attack from happening again.

32.     The letter failed to notify Plaintiff that some of the stolen information had already appeared on the dark web.

33.     Notwithstanding that the letter claimed that Defendant cares about Plaintiff's information, Defendant offered Plaintiff only a single year of credit monitoring services, which is woefully inadequate to redress the harms caused by Defendant's failures.

34.     As with all recipients, Defendant told Plaintiff and the proposed Class Members that they should "be vigilant for incidents of fraud or identity theft by reviewing your account

---

[12] *Id.*
[13] *Id.*
[14] https://web.archive.org/web/20240223174051/https://socialresponsibility.asburyauto.com/community (Feb. 2, 2024, archive);
https://web.archive.org/web/20230418182312/https://socialresponsibility.asburyauto.com/community (April 18, 2023, archive).

statements and free credit reports for any unauthorized activity."[15]

35.    At Defendant's direction, Plaintiff suffered monetary harm in the form of spending his valuable time responding Defendant's Data Breach, including by frequently reviewing his accounts for fraudulent activity.

36.    The need to spend this time was not speculative because Plaintiff was merely performing the tasks that Defendant told him to perform, which Plaintiff believed—and still believes—was necessary given the instructions in Defendant's notification letter.

37.    Furthermore, the time spent mitigating the effects of Defendant's failures was more significant because Defendant failed to timely information Plaintiff of the Breach, thus requiring Plaintiff to review more account information for fraudulent activity.

38.    Plaintiff's and the proposed Class Members' PII was provided to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with their obligations to keep such information confidential and secure from unauthorized access. By failing to do so, Defendant put all Class Members at risk of identity theft, financial fraud, and other harms and caused Plaintiff and Class Members to have to spend their own valuable time responding to Defendant's failures.

39.    Moreover, Defendant's failures have now left Plaintiff and Class Members to deal with the anxiety and stress that is inherent in data breaches, especially those that expose individuals' social security numbers.

**D.  This Data Breach was Foreseeable by Defendant**

40.    Defendant tortiously failed to take the necessary precautions required to safeguard

---

[15] https://ago.vermont.gov/sites/ago/files/documents/2024-04-24%20Asbury%20Automotive%20Group%20Data%20Breach%20Notice%20to%20Consumer.pdf

and protect the PII of Plaintiff and the Class Members from unauthorized disclosure. Defendant's actions represent a flagrant disregard of Plaintiff's and the other Class Members' rights.

41.    Plaintiff and Class Members were the foreseeable and probable victims of Defendant's inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing PII and the critical importance of providing adequate security for that information.

42.    Cyber-attacks against companies such as Defendant are targeted and frequent. According to Forbes, there were at least 2,365 cyber attacks in 2023 with 343,338964 victims, with phishing attacks listed as one of the most common types.[16]

43.    According to the Identity Theft Resource Center, the emotional toll of identity crimes is expected to continue to increase such that "assistance providers will struggle to meet the emotional recovery needs of victims." Indeed, the report notes that "[i]dentity crime victimization is too often classified as not creating trauma for which a victim would require support, despite the fact that our latest *Consumer Impact Report* had 16 percent (16%) of respondents state they contemplated suicide as a result of victimization."[17]

44.    The increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone bothering to pay attention. According to IBM's 2022 report, "[f]or 83% of companies, it's not if a data breach will happen, but when."[18]

45.    PII is of great value to hackers and cybercriminals, and the data compromised in

---

[16] Mariah St. John, *Cybersecurity Stats: Facts and Figures You Should Know*, FORBES ADVISOR (Feb. 28, 2024, 2:33 PM), https://www.forbes.com/advisor/education/it-and-tech/cybersecurity-statistics.

[17] Identity Theft Resource Center, *2024 Predictions*, https://www.idtheftcenter.org/identity-theft-resource-center-2024-predictions (last accessed July 11, 2024).

[18] IBM, *Cost of a data breach 2022: A million-dollar race to detect and respond,* https://www.ibm.com/reports/data-breach (last accessed July 11, 2024).

the Data Breach can be used for a variety of unlawful and nefarious purposes, including ransomware, fraudulent misuse, sale on the dark web, extortion, financial fraud, and identity theft. Indeed, at least a portion of the stolen data was already posted to the dark web by Cactus, the cyber gang that stole the data.

46.     PII can be used to distinguish, identify, or trace an individual's identity, such as their name, social security number, and financial records. This can be accomplished alone, or in combination with other personal or identifying information that is connected, or linked to an individual, such as their birthdate, birthplace, and mother's maiden name.

47.     Given the nature of the data collected, and the fact that data breaches are a well-known threat to all companies that store such information, Defendant was on notice of the harms associated with its failure to implement reasonable, industry standard cybersecurity safeguards.

**E.  Defendant Failed to Comply with FTC Guidelines and other Industry Standards**

48.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

49.     In 2016, the FTC updated its publication, *Protecting PII: A Guide for Business*, which establishes cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of PII that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the

system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[19]

50.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[20]

51.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

52.     These FTC enforcement actions include actions against entities failing to safeguard PII such as Defendant. *See, e.g.*, *In the Matter of LabMD, Inc., A Corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

53.     Defendant failed to properly implement basic data security practices widely known throughout the industry. Defendant's failure to employ reasonable and appropriate measures to

---

[19] *See* Federal Trade Commission, *Protecting Private information: A Guide for Business* (October 2016), https://www.bulkorder.ftc.gov/system/files/publications/2_9-00006_716a_protectingpersinfo-508.pdf.
[20] *See id.*

10

protect against unauthorized access to customer PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

54.    Defendant was always fully aware of its obligations to protect the PII of Plaintiff and the Class Members. Defendant was also aware of the significant repercussions that would result from its failure to do so.

55.    For example, the FTC notes that companies should maintain central log files, monitor incoming traffic for signs of malicious attempts and activity, and monitoring outgoing traffic to identify signs of data exfiltration.[21] If Defendant had these controls in place, it would have realized that cybercriminals had infiltrated its systems, were performing reconnaissance to identify valuable data, and it likely would have realized that the data was being exfiltrated before it was too late.

56.    A number of industry and national best practices have been published and are widely used as a go-to resource when developing an institution's cybersecurity standards.

57.    The Center for Internet Security's (CIS) CIS Critical Security Controls (CSC) recommends certain best practices to adequately secure data and prevent cybersecurity attacks, including 18 Critical Security Controls of Inventory and Control of Enterprise Assets, Inventory and Control of Software Assets, Data Protection, Secure Configuration of Enterprise Assets and Software, Account Management, Access Control Management, Continuous Vulnerability Management, Audit Log Management, Email and Web Browser Protections, Malware Defenses, Data Recovery, Network Infrastructure Management, Network Monitoring and Defense, Security Awareness and Skills Training, Service Provider Management, Application Software Security,

---

[21] *Id.* at pp. 21–22.

Incident Response Management, and Penetration Testing.[22]

58.     In addition, the National Institute of Standards and Technology (NIST) recommends certain practices to safeguard systems, *infra,* such as:

- Control who logs on to your network and uses your computers and other devices.

- Use security software to protect data.

- Encrypt sensitive data, at rest and in transit.

- Conduct regular backups of data.

- Update security software regularly, automating those updates if possible.

- Have formal policies for safely disposing of electronic files and old devices.

- Train everyone who uses your computers, devices, and network about cybersecurity. You can help employees understand their personal risk in addition to their crucial role in the workplace.[23]

59.     Further still, the Cybersecurity & Infrastructure Security Agency makes specific recommendations to organizations to guard against cybersecurity attacks, including (1) reducing the likelihood of a damaging cyber intrusion by validating that "remote access to the organization's network and privileged or administrative access requires multi-factor authentication, [e]nsur[ing] that software is up to date, prioritizing updates that address known exploited vulnerabilities identified by CISA[,] [c]onfirm[ing] that the organization's IT personnel have disabled all ports

---

[22] *See* Rapid7, *CIS Top 18 Critical Security Controls Solutions*,
https://www.rapid7.com/solutions/compliance/critical-controls (last accessed July 11, 2024).
[23] Federal Trade Commission, *Understanding the NIST Cybersecurity Framework*,
https://www.ftc.gov/business-guidance/small-businesses/cybersecurity/nist-framework (last accessed July 11, 2024).

and protocols that are not essential for business purposes," and other steps; (2) taking steps to quickly detect a potential intrusion, including "[e]nsur[ing] that cybersecurity/IT personnel are focused on identifying and quickly assessing any unexpected or unusual network behavior [and] [e]nabl[ing] logging in order to better investigate issues or events[;] [c]onfirm[ing] that the organization's entire network is protected by antivirus/antimalware software and that signatures in these tools are updated," and (3) "[e]nsur[ing] that the organization is prepared to respond if an intrusion occurs," and other steps.[24]

60.    Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established frameworks for reasonable cybersecurity readiness, as well as failing to comply with other industry standards for protecting Plaintiff's and the proposed Class Members' PII, resulting in the Data Breach.

**F. The Data Breach Caused Plaintiff and the Class Members Injury and Damages**

61.    Plaintiff and members of the proposed Class have suffered injury and damages from the misuse of their PII that can be directly traced to Defendant, that has occurred, is ongoing, and/or imminently will occur.

62.    As stated above unauthorized cybercriminals stole Plaintiff's and the proposed Class Members' PII, including their social security numbers and other financial and identification

---

[24] Cybersecurity & Infrastructure Security Agency, *Shields Up: Guidance for Organizations*, https://www.cisa.gov/shields-guidance-organizations (last accessed July 11, 2024).

information, which has now at least in part been published to the dark web.

63.     The ramifications of Defendant's failure to keep Plaintiff's and the Class's PII secure are severe. Identity theft occurs when someone uses another's personal and financial information such as that person's name, account number, social security number, driver's license number, date of birth, or other information, such as addresses, without permission, to commit fraud or other crimes.

64.     Because Defendant failed to prevent the Data Breach, Plaintiff and the proposed Class Members have suffered, will imminently suffer, and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. Plaintiff and the Class Members have suffered, will imminently suffer, or are at an increased risk of suffering:

    a.     Fraudulent misuse of PII;

    b.     Monetary harm in the form of being forced to spend their own valuable time responding to Defendant's failures, including by reviewing their accounts for fraudulent activity and changing financial account information;

    c.     The loss of the opportunity to control how PII is used;

    d.     The compromise and continuing publication of their PII;

    e.     Out-of-pocket expenses associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

    f.     Delay in receipt of tax refund monies;

    g.     Increase in spam texts and telephone calls;

    h.     Unauthorized use of stolen PII; and

    i.     The continued risk to their PII, which remains in the possession of Defendant's possession and control and is subject to further breaches so

long as Defendant fails to undertake the appropriate measures to protect the PII in their possession.

65.    Furthermore, the Data Breach has placed Plaintiff and the proposed Class Members at an increased risk of fraud and identity theft.

66.    Just like Defendant's instructions, the FTC recommends that identity theft victims spend their time and effort on intensive and/or costly tasks designed to help protect their personal and financial information after a data breach, including contacting the company where the fraud occurred and asking them to close or freeze accounts and changing login information; contacting one of the credit bureaus to place a fraud alert on credit files (consider an extended fraud alert that lasts for 7 years if someone steals their identity); reviewing their credit reports; seeking a credit freeze; correcting their credit reports; and other steps such as contacting law enforcement and reporting the identity theft to the FTC.[25]

67.    Identity thieves use stolen PII such as social security numbers, which were stolen here, for a variety of crimes, including credit card fraud phone or utilities fraud, and bank/finance fraud.

68.    Identity thieves can also use social security numbers to obtain a driver's license or official identification card in the victim's name (to the extent not already stolen in the Data breach) but with the thief's picture; use the victim's name and social security number to obtain government benefits; or file a fraudulent tax return using the victim's information.

69.    In addition, identity thieves may obtain a job using the victim's social security number, rent a house or receive other services in the victim's name, and may even give the victim's

---

[25] *See* Federal Trade Commission, https://www.identitytheft.gov/Steps (last accessed July 11, 2024).

PII to police during an arrest—resulting in an arrest warrant being issued in the victim's name. That can be even more problematic and difficult to remedy for someone who already has a criminal record.

70. Moreover, the emotional trauma, stress, and anxiety suffered by Data Breach victims is severe. The fear for the financial future because they are helpless to prevent such harm on their own, some develop eating disorders, and in some cases the emotion toll manifests as post-traumatic stress disorder. Indeed, it is not uncommon for the stress and anxiety created by a data breach to result in physical harm in the form of sleep deprivation. "Being a cybercrime victim can become a vicious cycle. You might be unable to get a full night's sleep because you're worried about your situation. This sleeplessness is due to higher levels of the stress hormones cortisol and adrenaline."[26]

71. Further, according to the Identity Theft Resource Center's 2021 Consumer Aftermath Report, identity theft victims suffer "staggering" emotional tolls: For example, nearly 30% of victims have been the victim of a previous identity crime; an all-time high number of victims say they have contemplated suicide. 35% reported not having enough money to pay for food and utilities, while 14% were evicted because they couldn't pay rent or their mortgage. 54% percent reported feelings of being violated. [27]

72. It must also be noted there may be a substantial time lag–measured in years–

---

[26] Stanley Clark, *The Psychological Impact on the Lives of Cyber-Attack Victims*, PAINTED BRAIN (Aug. 27, 2023), https://paintedbrain.org/painted-brain-media/blogs/the-psychological-impact-on-the-lives-of-cyber-attack-victims.

[27] Jason Steele, *Credit Card and ID Theft Statistics*, CREDITCARDS.COM (June 11, 2021), https://www.creditcards.com/statistics/credit-card-security-id-theft-fraud-statistics-1276 (citing Identity Theft Resource Center, *2021 Consumer Aftermath Report* (May 26, 2021), https://www.idtheftcenter.org/post/the-identity-theft-resource-centers-2021-consumer-aftermath-report-reveals-impacts-on-covid-19-identity-crime-victims).

between when breach occurs and when identity theft and financial fraud occurs. Though some victims see immediate fraud on their accounts, others do not because cybercriminals often wait until the victims' credit monitoring service expires to perpetrate their financial crimes.

73.    "For the individual who is a victim of stolen data, this can often lead to headaches: changing passwords frequently, enacting credit freezes or identity monitoring, and so on."[28]

74.    PII are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years. This is especially the case here given that the data has at least partially been posted to the dark web already.

75.    Social security numbers are among the worst kind of PII to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud.[29]

76.    For example, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines. Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[30] Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security number

---

[28] Center for Internet Security, *How You're Affected by Data Breaches*, https://www.cisecurity.org/insights/blog/how-youre-affected-by-data-breaches (last accessed July 11, 2024).
[29] *See* U.S. Social Security Administration, *Identity Theft and Your Social Security Number*, Publication No. 05-10064 (July 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.
[30] *See id.*

was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

77.     Moreover, it is not an easy task to change or cancel a stolen social security number. An individual cannot obtain a new social security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[31]

78.     This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."[32]

79.     Accordingly, the Data Breach has caused Plaintiff and the proposed Class Members a greatly increased risk of identity theft and fraud, in addition to the other injuries and damages set forth herein, specifically the unauthorized disclosure, lost time and efforts in remediating the impact of the Data Breach, and other injury and damages as set forth in the preceding paragraphs.

80.     Defendant knew or should have known of these harms which would be caused by the Data Breach that they permitted to occur and strengthened their data systems accordingly.

---

[31] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.
[32] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT WORLD (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

## CLASS ALLEGATIONS

81.    Plaintiff brings this nationwide class action individually and on behalf of all other persons similarly situated pursuant to Rule 23(a) of the Federal Rules of Civil Procedure, and Fed. R. Civ. P. 23(b)(3).

82.    Plaintiff proposes the following Class definition ("Nationwide Class"), subject to amendment based on information obtained through discovery:

> **All persons whose PII was compromised because of the Data Breach experienced by Defendant beginning on or about December 23, 2023.**

83.    Though Defendant has admitted only that current and former employees were affected (and possibly candidates that were not employed) by the Data Breach, Defendant has not explained the areas of its systems that the attacker had access to, so it is entirely possible that the Class will include consumers who information Defendant stores and maintains as part of its maintenance and sales of vehicles, among other services. Thus, Plaintiff reserves the right to amend the proposed class definition.

84.    Excluded from the Class are Defendant's members, officers, directors, and employees; any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families, and members of their staff.

85.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of Class Members' claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims for each Class Member.

86.     This action satisfies the requirements for a class action under Fed. R. Civ. P. 23(a)(1)-(3) and Fed. R. Civ. P. 23(b)(2), including requirements of numerosity, commonality, typicality, adequacy, predominance, and superiority.

87.     **Numerosity, Fed. R. Civ. P. 23(a)(1):** The members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, based on information and belief, the PII of approximately 279,063 individuals was compromised in the Data Breach. Such information is readily ascertainable from Defendant's records.

88.     **Commonality, Fed. R. Civ. Proc. 23(a)(2), and Predominance, Fed. R. Civ. Proc. 23(b)(3):** There are numerous questions of law and fact common to the Class. As such, there is a well-defined community of interest among the Members of the Class. These questions predominate over questions that may affect only individual Class Members because Defendant has acted on grounds generally applicable to the Class. Such common legal or factual questions include, but are not limited to:

a.     Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' PII;

b.     Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.     Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

d.     Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations including, *e.g*., the FTC Act;

e.      Whether computer hackers obtained Plaintiff's and Class Members' PII in the Data

Breach;

f.      Whether Defendant knew or should have known that their data security systems

and monitoring processes were deficient;

g.      Whether Defendant failed to adequately respond to the Data Breach, including

failing to timely notify the Plaintiff and the Class Members;

h.      Whether Defendant's failures amounted to negligence;

i.      Whether Defendant breached their contractual promises;

j.      Whether Defendant were unjustly enriched;

k.      Whether Defendant intruded into the private affairs of Plaintiff and the proposed

Class Members;

l.      Whether Plaintiff and the Class Members suffered legally cognizable damages as a

result of Defendant's misconduct;

m.      Whether Defendant's acts violated the law, and;

n.      Whether Plaintiff and the Class Members are entitled to damages including

compensatory and punitive damages, and/or injunctive relief.

89.      **Typicality, Fed. R. Civ. P. 23(a)(3):** The claims or defenses of Plaintiff are typical

of the claims or defenses of the proposed Class because Plaintiff's claims are based upon the same

legal theories and same violations of law. Plaintiffs' claims are typical of those of other Class

Members because Plaintiff's PII, like that of every other Class Member, was compromised in the

Data Breach, and all arise from the same set of facts regarding Defendant's failures:

a.      to protect Plaintiff's and Class Members' PII;

b.      to discover and remediate the Breach of its computer systems more quickly; and

c.      to disclose to Plaintiff and Class Members in a complete and timely manner information concerning the security breach and the theft of their Personal Information.

90.     **Adequacy, Fed. R. Civ. P. 23(a)(4):** Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff's Counsel are competent and experienced in litigating class actions.

91.     **Superiority, Fed. R. Civ. P. 23(b)(3):** A class action is a superior method for the fair and efficient adjudication of this controversy because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, and joinder of the Class Members is otherwise impracticable. Class treatment presents a superior mechanism for fairly resolving similar issues and claims without repetitious and wasteful litigation for many reasons, including the following:

a.      It would be a substantial hardship for most individual members of the Class if they were forced to prosecute individual actions. Many members of the Class are not in the position to incur the expense and hardship of retaining their own counsel to prosecute individual actions, which in any event might cause inconsistent results.

b.      When the liability of Defendant has been adjudicated, the Court will be able to determine the claims of all members of the Class. This will promote global relief and judicial efficiency in that the liability of Defendant to all Class Members, in terms of money damages due and in terms of equitable relief, can be determined in this single proceeding rather than in multiple, individual proceedings where there will be a risk of inconsistent and varying results.

c.      A class action will permit an orderly and expeditious administration of the Class claims, foster economies of time, effort, and expense, and ensure uniformity of decisions.

If Class Members are forced to bring individual suits, the transactional costs, including those incurred by Defendant, will increase dramatically, and the courts will be clogged with a multiplicity of lawsuits concerning the very same subject matter, with identical fact patterns and the same legal issues. A class action will promote a global resolution and will promote uniformity of relief as to the Class Members and as to Defendant.

d.      This lawsuit presents no difficulties that would impede its management by the Court as a class action. The class certification issues can be easily determined because the Class includes only Defendant's client's customers, the legal and factual issues are narrow and easily defined, and the Class membership is limited. The Class does not contain so many persons that would make the Class notice procedures unworkable or overly expensive. The identity of the Class Members can be identified from Defendant's records, such that direct notice to the Class Members would be appropriate.

92.     **Injunctive and Declaratory Relief, Fed. R. Civ. Proc. 23(b)(2):** In addition, Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

93.     Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendant.

### COUNT I
### NEGLIGENCE
### (On Behalf of Plaintiff and the Class)

94.     Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

95.     Defendant collected the PII of Plaintiff and the proposed Class Members and stored this information in their computer information technology systems.

96.     Defendant had full knowledge of the sensitivity of the PII to which they were entrusted, and the types of harm that Plaintiff and the Class Members could and would suffer if the PII was wrongfully disclosed to unauthorized persons. Defendant had a duty to Plaintiff and each Class Member to exercise reasonable care in holding, safeguarding, and protecting that information, including by implementing logging, monitoring, and alerting systems sufficient to identify when malicious actors were performing reconnaissance activities and exfiltrating data.

97.     Plaintiff and the Class Members were the foreseeable victims of any inadequate safety and security practices. Plaintiff and the Class Members had no ability to protect their data in Defendant's possession.

98.     By collecting and storing this data in their computer systems, Defendant had a duty of care to use reasonable means to secure and safeguard it, to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which it could detect if that PII was exposed to the internet and to give prompt notice to those affected in the case of a data breach.

99.     Defendant owed a common law duty of care to Plaintiff and the Class Members to provide adequate data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected the PII.

100.     In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair

practice of failing to use reasonable measures to protect confidential data.

101.    Indeed, the FTC Act is both a basis for Defendant's negligence per se and anyway informs the standard of care that Defendant was required to act with.

102.    Defendant breached its duties, and were negligent, by acts of omission or commission, by failing to use reasonable measures to protect the Plaintiff's and Class Members' PII. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a.    Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiff's and Class Members' PII;

b.    Failing to adequately train employees on proper cybersecurity protocols;

c.    Failing to adequately monitor the security of their networks and systems;

d.    Failure to periodically ensure that their network system had plans in place to maintain reasonable data security safeguards;

e.    Allowing unauthorized access to Plaintiff's and Class Members' PII; and

f.    Failing to timely notify Plaintiff and Class Members about the Data Breach so that they could take timely and appropriate steps to mitigate the potential for identity theft and other damages.

103.    It was foreseeable that Defendant's failure to use reasonable measures to protect Plaintiff's and Class Members' PII would result in injury to Plaintiff and Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyber-attacks and data breaches in the industry.

104.    It was therefore foreseeable that the failure to adequately safeguard Plaintiff's and Class Members' PII would result in one or more types of injuries to them.

105.    As a direct and proximate result of Defendant's negligence set forth in the preceding paragraphs, Plaintiff and Class Members have suffered injury and damages as set forth herein, including but not limited to fraudulent misuse of their PII; loss of the opportunity to control how their PII is used; diminution in value of their PII; compromise and continuing publication of their PII; and are entitled to compensatory, actual, and punitive damages as a result of the Data Breach.

106.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

**COUNT II**
**INVASION OF PRIVACY—PUBLIC DISCLOSURE OF PRIVATE INFORMATION**
**(On Behalf of Plaintiff and the Class)**

107.    Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

108.    Georgia recognizes the tort of public disclosure of private facts.

109.    Restatement (Second) of Torts provides:

One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public. Restatement (Second) of Torts § 652D (1977).

110.    Publicity under this tort means that the disclosure was of such nature that the information is "substantially certain to become one of public knowledge."

111.    This is met here because Defendant disclosed Plaintiff's data to cybercriminals when it failed to implement reasonable cybersecurity measures knowing that the failure to implement those measures was substantially certain to lead to the publication of Plaintiff's data to cybercriminals. Indeed, those cybercriminals have now any further publicized the stolen data to

26

the dark web for even further cybercriminals and the public at large to view.

112.    Plaintiff and the Class Members had a legitimate expectation of privacy to their PII and were entitled to the protection of this information against disclosure to unauthorized third parties.

113.    Defendant owed a duty to Plaintiff and the Class Members to keep their PII confidential.

114.    Given the nature of the data, including Plaintiff's social security number, the disclosure of this information to cybercriminals and the world at large is highly offensive to the reasonable person in Plaintiff's shoes.

115.    The Data Breach constitutes an intentional or reckless interference by Defendant with Plaintiff's and the Class Members' interests in keeping this PII private, and Defendant was substantially certain that its failures were likely to result in the harm to Plaintiff and the proposed Class Members that ultimate did occur and will continue to occur.

116.    Defendant acted with a knowing state of mind when they permitted the Data Breach to occur because they had actual knowledge that their data security practices were inadequate and insufficient and were aware of the attendant harms.

117.    As a direct and proximate result of the Defendant's invasion of privacy, the PII of Plaintiff and the Class Members was disclosed to third parties without authorization, causing Plaintiff and the Class Members to suffer injury and damages as set forth herein, including but not limited to fraudulent misuse of their PII; loss of the opportunity to control how their PII is used; compromise and continuing publication of their PII; and are entitled to damages.

118.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen their data security systems and monitoring procedures; (ii) submit to

future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

119.    Unless and until enjoined, and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class Members in that the PII maintained by Defendant can be viewed, distributed, and used by unauthorized persons for years to come. Plaintiff and the Class Members have no adequate remedy at law for the injuries in that a judgment for monetary damages will not end the invasion of privacy for Plaintiff and the Class Members.

## COUNT III
## BREACH OF BAILMENT
### (On Behalf of Plaintiff and the Class)

120.    Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

121.    A bailment is "a delivery of goods or property upon a contract, express or implied, to carry out the execution of a special object beneficial either to the bailor or the bailee or both and to dispose of the property in conformity with the purpose of the trust." Ga. Code § 44-12-40.

122.    Plaintiff bailed his valuable personal information, including his social security number, to Defendant as part of an express or implied employment contract.

123.    Implicit in that agreement was an understanding that Defendant would use Plaintiff's information for only the purposes underlying the agreement—for matters required to employ Plaintiff—and for no other purposes. Also implicit in the agreement was that Defendant would take reasonable steps to protect the security of Plaintiff's information.

124.    Without the implicit understanding that Defendant would take reasonable steps to protect Plaintiff's information, he would never have agreed to the contract and/or would have

insisted that Defendant take steps to enhance their security. Rather, it was understood that Defendant had these measures in place to the ubiquitous of data breaches and the seriousness of the harm that is inherent in data breaches.

125.    Implicit in the Parties understanding was that Defendant would only use Plaintiff's data for the purposes of employment and would only keep such data while Plaintiff was working for Defendant and only thereafter as legally required—such that Defendant was expected to destroy Plaintiff's when it was no longer needed.

126.    In failing to reasonably protect Plaintiff's data and failing to destroy it once Defendant was no longer required to retain it, Defendant violated Plaintiff's trust, constituting a breach of bailment.

127.    Defendant's breach caused Plaintiff significant harm in the form of a privacy violation, mental and emotional anguish, monetary harm in the form of lost time spent responding to Defendant's failures, and exposed Plaintiff to years of heighten risk of identity theft and financial fraud.

128.    Moreover, because Defendant still maintains Plaintiff's data, Plaintiff has standing to seek injunctive relief, including the implementation of reasonable cybersecurity safeguards and a data retention policy that is enforced to minimize the data Defendant keeps.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, BRENDAN SIEBELS, on behalf of himself, and all others similarly situated, prays for judgment as follows:

A.    Trial by jury pursuant to Fed. R. Civ. Proc. 38(b) on all claims so triable;

B.    An Order certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representative, and appointing his counsel to

represent the Class;

C.    Awarding Plaintiff and the Class damages that include applicable compensatory, actual, exemplary, and statutory damages, and punitive damages, as allowed by law;

D.    Awarding restitution and damages to Plaintiff and the Class in an amount to be determined at trial;

E.    Awarding declaratory and other equitable relief as is necessary to protect the interests of Plaintiff and the Class;

F.    Awarding injunctive relief as is necessary to protect the interests of Plaintiff and the Class;

G.    Enjoining Defendant from further deceptive practices and making untrue statements about the Data Breach and the transmitted PII;

H.    Awarding attorneys' fees and costs, as allowed by law;

I.    Awarding prejudgment and post-judgment interest, as provided by law;

J.    Granting Plaintiff and the Class leave to amend this complaint to conform to the evidence produced at trial; and,

K.    Any and all such relief to which Plaintiff and the Class are entitled.


Dated: July 16, 2024                    Respectfully submitted,

                                        */s/ Joseph B. Alonso*
                                        Joseph Alons (GA Bar # 013627)
                                        Daniel H. Wirth (GA Bar # 873443)
                                        **ALONSO WIRTH**
                                        1708 Peachtree Street NE, Suite 207
                                        Atlanta, GA 30309
                                        (678) 928-4479
                                        jalonso@alonsowirth.com
                                        dwirth@alonsowirth.com

J. Gerard Stranch, IV *
Grayson Wells*
**STRANCH, JENNINGS & GARVEY, PLLC**
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
(615) 254-8801
gstranch@stranchlaw.com
gwells@stranchlaw.com

*Motion for *Pro Hac Vice* Admission
forthcoming

***Counsel for Plaintiff and the Proposed Class***